UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SHAKITTA HOLMES,

                            Plaintiff,

                 - against -

ASTOR SERVICES FOR CHILDREN & FAMILIES,
RENEE FILLETTE, PhD, EDWARD PRUITT,
DIANNE WOLFF, NPP, KATE BAGSHAW, and
KATHERINE RIDER, RN,

                            Defendants.
-------------------------------------------------------------------x

**OPINION AND ORDER**

No. 16-CV-2260 (CS)

Appearances

Jimmy Miguel Santos
Law Offices of Jimmy M. Santos, PLLC
Cornwall, New York
*Counsel for Plaintiff*

Laura Wong-Pan
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Counsel for Defendants*

Seibel, J.

      Before the Court is Defendants' Motion for Summary Judgment. (Doc. 68.) For the following reasons, the Motion is GRANTED.

## I.    BACKGROUND

      The following facts, which are based on Defendants' Local Rule 56.1 Statement, (Doc. 69 ("56.1 Stmt.")), and supporting materials, are undisputed.

###    A.    Staffing Issues at Astor Services for Children & Families ("Astor")

      Plaintiff is a registered Licensed Practical Nurse ("LPN") who worked in Astor's health clinic, which services a Residential Treatment Facility ("RTF") and Residential Treatment

1

Center ("RTC") in Rhinebeck, New York. (56.1 Stmt. ¶¶ 1, 2, 10.) Astor's RTF is overseen by the New York State Office of Mental Health ("OMH"). (*Id.* ¶ 2.) Plaintiff was hired as a child care worker in 2002, and assumed the higher-paid position of LPN in 2007. (*Id.* ¶ 11; Doc. 73 ("Wong-Pan Decl.") Ex. Y at 19:24-20:12.) There are several differences between LPNs and RNs, including more extensive educational requirements for RNs, (56.1 Stmt. ¶ 18), and duties that RNs can and LPNs cannot perform, including: assessing patients; completing a physical on a child; performing duties without an RN in the clinic; responding to situations involving physical restraints on children; reading skin tests used to diagnose tuberculosis; and treating children at the RTF, (*id.* ¶ 19). There is nothing that an LPN can do that an RN cannot do. (*Id.* ¶ 20.) Astor had ceased hiring LPNs several years prior to the commencement of this action. (*See id.* ¶ 15.)

To comply with OMH requirements, Astor must maintain an operating certificate. (*Id.* ¶ 21.) On September 15-16, 2015 – approximately two weeks prior to the expiration of Astor's operating certificate – OMH visited Astor as part of its "focused provider monitoring" and determined that the RTF did not meet minimum standards for recertification because of "recurring challenges in the nursing department." (*Id.* ¶¶ 22-24 (quoting Wong-Pan Decl. Ex. U).) On September 30, 2015, OMH refused to reissue Astor's operating certificate. (*Id.* ¶ 25.) In response, Chief Operating Officer Renee Fillette, PhD issued a memorandum to the health clinic staff, stating that, "[u]nder no conditions whatsoever can there be any uncovered nursing shifts. There are no exceptions." (*Id.* ¶ 29.) On October 13, 2015, OMH representatives met with Dr. Fillette, Director of Nursing Dianne Wolff, Assistant Executive Director Edward Pruitt, Medical Director Dr. Suzanne Button, and others to address OMH's concerns. (*Id.* ¶¶ 4, 31.) At the meeting, Astor's representatives proposed to eliminate the LPN positions and hire more RNs,

2

a step that an OMH auditor also suggested. (*Id.* ¶¶ 32, 33.) Shortly thereafter, Astor compiled and submitted to OMH a Performance Improvement Plan ("PIP") that "described incentives for RNs to assure coverage while new RNs are hired, and described a staffing analysis to ensure 24/7 RN coverage." (*Id.* ¶¶ 34, 35; Doc. 70 ("Bagshaw Aff.") Ex. A.)

On November 20, 2015, OMH sent Astor a letter explaining that it had evaluated Astor's implementation of the PIP and concluded that Astor "meets minimum standards for recertification," while noting that it would "continue to conduct focused monitoring to ensure sustained progress and compliance." (56.1 Stmt. ¶ 37; Bagshaw Aff. Ex. B.) On November 25, 2015, Wolff and Dr. Button sent a memorandum to Dr. Fillette and Pruitt recommending elimination of the LPN position. (56.1 Stmt. ¶ 38; Bagshaw Aff. Ex. C.) The final decision to eliminate the LPN position was made by Astor's Chief Executive Officer in or around December 2015, (56.1 Stmt. ¶ 41), with implementation to occur by January 15, 2016, (*id.* ¶ 43). On or about December 16, 2015, Astor's Director of Human Resources Kate Bagshaw, (*id.* ¶ 5), and Pruitt met with Plaintiff to give her a letter informing her of the elimination of the LPN title, her right to be recalled, and her right to "retreat to the child care worker position," (*id.* ¶ 44), which Plaintiff declined to do, (*id.* ¶ 47).[1] Susanne LaBarbera, a Caucasian per diem LPN working at the health clinic, was also informed in writing that the LPN position was being eliminated, and that she would remain on a recall list for two years. (56.1 Stmt. ¶¶ 13, 45.) After the LPN title was eliminated, Astor hired at least two new RNs – one of whom is African-American, (*id.* ¶ 48) – which resolved the nurse staffing shortages, (*id.* ¶¶ 51-52).

---

[1] The right to "retreat" was seemingly based on the collective bargaining agreement governing Plaintiff's position. (Ds' Mem. at 10; *see* Wong-Pan Decl. Ex. R.)

### B. Plaintiff's Employment Record

In 2013, Plaintiff was placed on a "Corrective Action Plan," and was written up for deficiencies in her work and for failing to follow proper procedures. (*Id.* ¶¶ 55-58.) In 2014, Plaintiff was written up for errors in following medication administration procedures and reporting medication errors. (*Id.* ¶¶ 59-60.) On March 20, 2015, Plaintiff and a Caucasian RN were written up when Plaintiff, rather than the RN, responded when a child was restrained in the RTF, (*id.* ¶ 62), but Plaintiff testified that this write-up was not disciplinary in nature, (*id.* ¶ 63). At some point, the nursing supervisor opined that she thought Plaintiff should be terminated. (*Id.* ¶¶ 53, 61.)

On May 16, 2015, Plaintiff and Katherine Rider, RN, clashed at work. Plaintiff told Nina Asch, the scheduling coordinator and health clinic manager, that she did not want to work with Rider. (*Id.* ¶¶ 65-67.) Asch responded that she would try to find someone to cover for Plaintiff, and suggested that Plaintiff and Rider stay on opposite sides of the clinic throughout their shifts. (*Id.* ¶¶ 68-69.) Plaintiff retreated to a room where medications are stored, (*id.* ¶ 70), which is supposed to stay locked with nurses swiping their badges to enter, (*id.* ¶ 74), and stayed there for "most of the shift," playing music that she refused to turn down. (*Id.* ¶¶ 72, 75-76.) On May 17, 2015, Plaintiff returned to work, but Astor had called an RN in to cover for her in the belief that she was not coming in after the prior day's events. (*Id.* ¶¶ 80-81.) Plaintiff told the RN that she was going to stay, so the RN left. (*Id.* ¶ 82.) On May 18, 2015, Rider complained verbally and sent an email to Asch complaining about Plaintiff's conduct. (*Id.* ¶¶ 83-84.) On July 8, 2015, Bagshaw and Pruitt interviewed Plaintiff about the May 16-17 incident, (*id.* ¶ 89), after having received accounts from Rider, Asch, Bagshaw, and the RN who was called in on May 17, (*id.* ¶¶ 86, 87, 89). Over the next several days, Plaintiff also received unrelated criticism from

Astor's Director of Nursing Carolyn Clark about deficiencies in her nursing documentation. (*Id.* ¶¶ 79, 90, 93-98, 100.)

Because of the May 16-17 incident and the documentation problems, and with the counsel of her union representative, (*id.* ¶ 113), Plaintiff entered into a Stipulation of Agreement with Astor on August 6, 2015, (*id.* ¶ 102; Wong-Pan Decl. Ex. J), admitting to documentation deficiencies and acting "in a manner that was not appropriate in the workplace," and agreeing to a two-day suspension without pay, (56.1 Stmt. ¶¶ 101-05; Wong-Pan Decl. Ex. J).

### C. Plaintiff's Schedule Change

From August 2014 to at least May 2015, Astor permitted Plaintiff to have two days off each week, as well as every other weekend. (*Id.* ¶¶ 162, 164, 166.) At the end of May 2015, Clark asked Bagshaw whether the health clinic was required to continue Plaintiff's special schedule, in part because the difficulty in scheduling around Plaintiff's requested days off contributed to the ongoing nursing coverage issues. (*Id.* ¶¶ 167-69.) On July 13, 2015, Clark informed Plaintiff via email that Astor could no longer accommodate her special schedule, stating that she could "always make switches with other staff with approval," but that she should "limit [her] weekend shifts to one a month." (*Id.* ¶ 170 (quoting Wong-Pan Decl. Ex. I).) This email was forwarded to Wolff on August 31, 2015. (*Id.* ¶ 174.) The new schedule was to take effect on August 10, 2015. (*Id.* ¶ 171.)

### D. Plaintiff's July 8, 2015 Email

At some point on July 7, 2015, a call was made over the walkie talkie system for a nurse to respond to a restraint at a RTC unit because a child had fallen. (*Id.* ¶¶ 124, 135.) On that day, Plaintiff was the "primary nurse" staffed in the unit, meaning that she was responsible for that unit, (*id.* ¶ 129), and she responded to the call in a manner that did not compromise the child's

5

safety, (*id.* ¶ 130). Common practice dictates that only one nurse need respond to such a call, (*id.* ¶ 128), and there is no rule or regulation requiring all nurses to respond to a call, (*id.* ¶¶ 141, 143). Also on July 7, 2015, Plaintiff responded to a separate call regarding a child who had fallen and hit his head. (*Id.* ¶¶ 134-36.) Plaintiff testified that the child's safety was not at risk and that her response was timely and appropriate. (*Id.* ¶ 139.) On July 8, 2015, Plaintiff sent an email to Fillette regarding the two incidents that occurred the prior day, complaining that she had been the only nurse to respond and that that fact showed a "poor work ethic." (*Id.* ¶ 119 (quoting Wong-Pan Ex. F); *see id.* ¶ 120.)

### E. Plaintiff's Discrimination Complaint

Plaintiff submitted a written complaint of discrimination, which Astor received on September 14, 2015. (*Id.* ¶ 147.) After receiving the complaint, Bagshaw interviewed Plaintiff and inquired how Plaintiff was treated differently or retaliated against because of her race. (*Id.* ¶ 149.) Plaintiff responded that she was discriminated against because of meetings with human resources. (*Id.* ¶ 150.) Bagshaw interviewed several potential witnesses, including LaBarbera, and each responded that they did not believe Plaintiff was treated differently because of her race. (*Id.* ¶¶ 152-56.) On October 20, 2015, Bagshaw gave Plaintiff a letter summarizing her investigation, which concluded that Plaintiff was not subject to discrimination. (*Id.* ¶ 157; Wong-Pan Ex. O.) Plaintiff testified that she never heard any named Defendant make any racist statements, (Wong-Pan Decl. Ex. Y at 197:6-9), and Plaintiff's union representative testified that he had never heard Rider, Bagshaw, Fillette, or Pruitt (who is African American) make racist statements, (56.1 Stmt. ¶¶ 181, 184, 188, 195).

6

F.   **Procedural History**

On March 28, 2016, Plaintiff filed the Complaint in this action against Astor, Fillette, Pruitt, Wolff, Bagshaw, and Rider, (Doc. 1), alleging employment discrimination based on race, a hostile work environment, and retaliation under 42 U.S.C. § 1981, and whistleblower retaliation under New York Labor Law ("NYLL") §§ 740 & 741.  Defendants answered on May 4, 2016, (Doc. 28), and the parties proceeded to discovery.  Defendants filed the instant motion for summary judgment on January 30, 2017.  (Doc. 68.)  Plaintiff did not oppose the motion.[2]

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "A non-moving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts

---

[2] Plaintiff's Counsel is directed to provide a copy of this Opinion and Order to Plaintiff.

7

asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).

"Failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). But in the typical case, failure to respond results in a grant of summary judgment once the Court assures itself that Rule 56's other requirements have been met. *See T.Y.*, 584 F.3d at 418.

## III. DISCUSSION

### A. Employment Discrimination Based On Race

#### 1. *Prima Facie* Case

Defendants argue that Plaintiff has not set forth a *prima facie* case of race discrimination, and that even if she had, there is a legitimate, non-discriminatory reason for Plaintiff's adverse employment action. (Doc. 72 ("Ds' Mem.") at 9-10.)

Discrimination claims brought under § 1981 are analyzed pursuant to the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.[3] Under this framework, a plaintiff bears the initial and minimal burden of establishing a *prima facie* case of discrimination. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). To make out a *prima facie* case, a plaintiff must show that, "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse

---

[3] "While *McDonnell Douglas* . . . involved claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, courts have held that discrimination and retaliation claims brought under 42 U.S.C. § 1981 . . . follow the same analysis." *Thomas v. N.Y.C. Health & Hosps. Corp.*, No. 02-CV-5159, 2004 WL 1962074, at *16 n.7 (S.D.N.Y. Sept. 2, 2004).

employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

Once a *prima facie* case is established, a "rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Once the defendant proffers a legitimate, non-discriminatory reason, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc*., 257 F.3d 164, 168 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp*., 248 F.3d 87, 91 (2d Cir. 2001). The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (alterations and internal quotation marks omitted). "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'" *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated. *Reeves*, 530 U.S. at 143.

Defendants do not contest that Plaintiff is a member of a protected class and was qualified for the LPN position. Defendants are correct that Plaintiff's meetings with human resources and a schedule change do not constitute adverse employment actions. *See Adams-*

9

*Martin v. Conn. Dep't of Developmental Servs.*, No. 10-CV-99, 2012 WL 878306, at *12 (D. Conn. Mar. 14, 2014) ("A disciplinary meeting, without any further consequence, is not a material change in the terms and conditions of employment."); *Ludwig v. Rochester Psychiatric Ctr.*, 550 F. Supp. 2d 394, 399 (W.D.N.Y. 2008) (no adverse employment action where there were minor changes to plaintiff's work schedule and weekends off); *Rivera v. Potter*, No. 03-CV-1991, 2005 WL 236490, at *5 n.5 (S.D.N.Y. Jan. 31, 2005) (unwanted schedule change is not adverse employment action). But Plaintiff's two-day suspension without pay after the May 16-17, 2015 incident and the elimination of the LPN position, after which Plaintiff was offered a position that paid less, (56.1 Stmt. ¶ 44; Wong-Pan Decl. Ex. Y at 19:24-20:12; *see id.* Ex. J), are adverse employment actions under § 1981. *See Robinson v. Dep't of Motor Vehicle*, No. 16-CV-1148, 2017 WL 2259767, at *11 (D. Conn. May 23, 2017) (two-day suspension qualifies as adverse action); *Waters v. Gen. Bd. of Glob. Ministries*, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) (two-day suspension without pay treated as adverse employment action); *Gallo v. Second Taxing Dist. of City of Norwalk*, 507 F. Supp. 2d 164, 174 (D. Conn. 2007) (elimination of position and transfer to another department is adverse employment action).

Plaintiff fails to make out a *prima facie* case, however, because there are no circumstances surrounding either the two-day suspension or the elimination of the LPN position that give rise to an inference of discrimination. Factors contributing to an inference of discriminatory intent include, but are not limited to:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Leibowitz*, 584 F.3d at 502 (internal quotation marks omitted).

Here, because the LPN position was eliminated, Defendants have not sought to replace Plaintiff with someone of similar qualifications; to the contrary, RNs were hired after the LPNs were let go. *See Watt v. N.Y. Botanical Garden*, No. 98-CV-1095, 2000 WL 193626, at *5 (S.D.N.Y. Feb. 16, 2000) (no inference of discrimination where employer never sought or hired replacement for plaintiff); *see also Zuffante v. Elderplan, Inc.*, No. 02-CV-3250, 2004 WL 744858, at *7 (S.D.N.Y. Mar. 31, 2004) (employer did not fill plaintiff's prior position after department was eliminated). Neither Plaintiff nor her union representative has heard Defendants make racist remarks. (56.1 Stmt. ¶¶ 181, 184, 188, 195; Wong-Pan Decl. Ex. Y at 197:6-9.) Defendants did not treat similarly-situated employees outside Plaintiff's protected class any more favorably; LaBarbera, a Caucasian LPN, was treated in the same manner as Plaintiff. (*See* 56.1 Stmt. ¶¶ 13, 45, 46.) Because there are no indicators that might suggest an inference of discrimination, Plaintiff has not established a *prima facie* case of race discrimination. *See Collazo v. Cty. of Suffolk*, 163 F. Supp. 3d 27, 48-49 (E.D.N.Y. 2016) (where plaintiff had not alleged that a similarly-situated employee that engaged in the same behavior was not suspended, nor that any racially charged comments were made in close proximity to plaintiff's suspension, there was no evidence giving rise to an inference of discrimination); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 516 (S.D.N.Y. 2003) (plaintiff could not establish a *prima facie* case of discrimination where employee outside his protected class was treated identically).

2. Legitimate, Non-Discriminatory Reasons

Even if Plaintiff could make out a *prima face* case of race discrimination, Defendants have provided a legitimate, non-discriminatory reason for the elimination of the LPN position and for Plaintiff's two-day suspension. Defendants provided evidence that they eliminated the LPN position to hire more RNs in an effort to address inadequate nursing staff coverage, which

11

was jeopardizing Astor's OMH certification and was a step OMH itself suggested. (56.1 Stmt. ¶¶ 24, 33, 38, 46.) Similarly, Plaintiff was suspended as a result of the May 16-17 incident and multiple documentation errors, as she admitted in a signed Stipulation of Agreement, in which she acknowledged the myriad reasons for her two-day suspension. (*See id.* ¶¶ 103-04; Wang-Pan Decl. Ex. J.) These legitimate non-discriminatory reasons for Plaintiff's adverse employment actions eradicate any presumption of discrimination. *See Taylor v. Family Residences & Essential Enters.*, No. 03-CV-6122, 2008 WL 268801, at *11 (E.D.N.Y. Jan. 30, 2008) (organization's decision not to offer plaintiff a specific position was legitimate and non-discriminatory where working particular shift would have led to staffing problems); *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 385 (S.D.N.Y. 2007) (plaintiff's poor work performance and insubordinate behavior provide ample justification for suspension).

Typically, the *McDonnell Douglas* analysis would next shift the burden to Plaintiff to show that the Defendants' legitimate, non-discriminatory justifications for Plaintiff's adverse employment actions were mere pretexts for discrimination. "In such situations, plaintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that the adverse action taken against her was more likely than not a product of discriminatory animus." *Leibowitz*, 584 F.3d at 504. But here, Plaintiff has failed to respond to Defendants' motion for summary judgment, and therefore, has not provided any evidence that Defendants' legitimate, non-discriminatory reasons for the elimination of the LPN position or Plaintiff's two-day suspension are pretextual. Accordingly, because Plaintiff has failed to satisfy her burden, Defendants are entitled to summary judgment on Plaintiff's race discrimination claim. *See Powell v. Consol. Edison Co. of N.Y., Inc.*, No. 97-CV-2439, 2001 WL 262583, at *8 n.10 (S.D.N.Y. Mar. 13, 2001) (where plaintiff failed to respond to proffered legitimate reason

12

with evidence of pretext, court considered claims abandoned and dismissed); *see also Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000) (*per curiam*) (affirming grant of summary judgment based on plaintiff's failure to deny statements of fact pursuant to Rule 56.1).

### B. Hostile Work Environment

To succeed on a hostile work environment claim, Plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Plaintiff must come forward with "evidence not only that [she] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *see Dawson v. Cty. of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004). Furthermore, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

"To decide whether the [hostile work environment] threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). "Pervasive" harassment is harassment that is "'more than episodic,'" and instead "'continuous and concerted.'" *Hayut*, 352 F.3d at 745 (quoting *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)). "The environment," however, "need not be unendurable or intolerable."

13

*Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted). "[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." *Id.* (internal quotation marks omitted). "[T]he Second Circuit has cautioned [that] the existence of a hostile work environment is a mixed question of law and fact. These kinds of questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Hill v. Taconic Developmental Disabilities Servs. Office*, 181 F. Supp. 2d 303, 321 (S.D.N.Y. 2002) (citation and internal quotation marks omitted), *vacated on other grounds by* 57 F. App'x 9 (2d Cir. 2003).

Here, the record contains no evidence of any discriminatory abuse whatsoever throughout Plaintiff's tenure at Astor, thus defeating Plaintiff's hostile work environment claim. *See Dickens v. Hudson Sheraton Corp.*, 167 F. Supp. 3d 499, 518 (S.D.N.Y. 2016) (no hostile work environment where "there [were] no remarks, stray or otherwise, of a racial . . . nature"), *aff'd*, No. 16-969-CV, 2017 WL 1755941 (2d Cir. May 4, 2017) (summary order); *Giscombe v. N.Y.C. Dep't of Educ.*, No. 12-CV-464, 2013 WL 829127, at *5-6 (S.D.N.Y. Feb. 28, 2013) (no hostile work environment despite disciplinary actions taken against plaintiff because he showed no evidence of racially charged remarks or similarly-situated plaintiffs outside the protected class being treated more favorably).

The elimination of the LPN position and Plaintiff's two-day suspension do not permit Plaintiff's hostile work environment claim to survive summary judgment. To the extent these events could be considered harassment, they are isolated instances that do not rise to the level of severe or pervasive. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (isolated instances of harassment ordinarily insufficient); *Braheney v. Town of Wallingford*, No. 00-CV-

14

2468, 2004 WL 721834, at *4 (D. Conn. Mar. 30, 2004) (four suspensions over three-year period insufficiently continuous and concerted to constitute hostile work environment). Further, "[e]ven if the [employer's] conduct w[as] objectively severe or pervasive, [Plaintiff]'s claim would still fail since[, as discussed above,] she has presented no evidence of having been subjected to the conduct because of her [race]." *Macshane v. City of N.Y.*, No. 05-CV-6021, 2015 WL 1298423, at *26 (S.D.N.Y. Mar. 23, 2015), *aff'd sub nom*, *Herlihy v. City of N.Y.*, 654 F. App'x 40 (2d Cir. 2010) (summary order); *see Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *59-60 (S.D.N.Y. Mar. 27, 2015) (summary judgment granted for defendants in hostile work environment claim where plaintiff offered no evidence that adverse employment actions were motivated by gender or national origin), *aff'd*, No. 15-1328-CV, 2017 WL 2889483 (2d Cir. July 7, 2017) (summary order). Thus, summary judgment is granted on Plaintiff's hostile work environment claim.

### C. Retaliation

Finally, § 1981 retaliation claims are also analyzed using the *McDonnell Douglas* burden-shifting framework. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *Cruz v. Oxford Health Plans, Inc.*, No. 03-CV-8863, 2008 WL 509195, at *10 (S.D.N.Y. Feb. 26, 2008).

To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she was engaged in activity protected under anti-discrimination statutes; (2) Defendants were aware of Plaintiff's participation in the protected activity; (3) Defendants took adverse action against Plaintiff; and (4) there is a causal connection between Plaintiff's protected activity and the adverse action taken by defendants. *See Fincher v. Depository Trust & Clearting Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). "To establish an adverse employment action for purposes of a

15

retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 224 (E.D.N.Y. 2014) (alteration omitted) (internal quotation marks omitted). A plaintiff may establish the causal connection indirectly by showing that the protected activity was closely followed by the retaliation, or directly by showing evidence of retaliatory animus. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

Plaintiff alleges that Defendants retaliated against her after she reported discriminatory conduct in September 2015 by eliminating the LPN position, imposing a two-day suspension, subjecting her to meetings with Human Resources, and forcing her to change her schedule. (Doc. 1 ¶¶ 26, 28, 30.) Defendants do not dispute that Plaintiff's discrimination complaint is a protected activity under § 1981 or that Plaintiff suffered an adverse employment action. Nonetheless, Plaintiff's claim fails because there is no causal connection between Plaintiff's protected activity and her adverse employment actions, and even if there were, Defendants have offered legitimate, non-retaliatory reasons for these actions.

First, Plaintiff's schedule change, human resources meetings, and two-day suspension occurred before she engaged in any protected activity. Plaintiff signed the Stipulation of Agreement accepting her suspension on August 6, 2015, (56.1 Stmt. ¶ 102), was informed on July 13, 2015 via email that her "special scheduling" would be terminated on August 10, 2015, (*id.* ¶¶ 170-71), and alleges that she attended disciplinary meetings on unspecified dates beginning in May 2015, (Doc. 1 ¶ 26).[4] Astor did not receive her discrimination complaint,

---

[4] The Complaint alleges that the hostile work environment began "in or about May 2015, and increasingly more so after July 8, 2015." (*Id.*) To the extent that any disciplinary meetings took place after Plaintiff filed her discrimination complaint in September 2015 (which is unclear from the record), there is no evidence from which a

however, until September 14, 2015. (56.1 Stmt. ¶ 147.) Because these allegedly retaliatory events all occurred before Plaintiff engaged in any protected activity, no causal connection can be established between them and her complaint of discrimination. *See Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011) ("The crux of any retaliation claim is a cause-and-effect relationship whereby protected activity precedes, and gives rise to, an adverse employment action. It is axiomatic that no such relationship can be found to exist where the alleged adverse employment action began and ended *prior* to the commencement of any protected activity.") (emphasis in original). Accordingly, Plaintiff failed to establish a *prima facie* case of retaliation with regard to her two-day suspension.

Second, Plaintiff presents no evidence from which it could be inferred that the elimination of the LPN position was causally related to Plaintiff's discrimination complaint. While causation may be established through a showing that the retaliatory act closely followed the protected activity, *see Cosgrove*, 9 F.3d at 1039, Plaintiff's discrimination complaint was received by Astor on September 14, 2015, (56.1 Stmt. ¶ 147), and the LPN position was eliminated three months later in December 2015, (*id.* ¶¶ 39-41). The Second Circuit has cited with approval the proposition that a three month gap can "negate any inference of causation," *see Brown v. City of N.Y.*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order) (citing *Williams v. City of N.Y.*, No. 11-CV-9679, 2012 WL 3245448, at *11 (S.D.N.Y. Aug. 8, 2012)), and courts in this Circuit "have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation," *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases).

---

reasonable juror could conclude that anything occurred at such meetings that would have "dissuade[d] a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

17

Further, even if the adverse action is regarded as having occurred in October 2015 when Defendants proposed the elimination of the LPN position, (*see* 56.1 Stmt. ¶¶ 31-32), an inference of causation is defeated "if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory [employment action]," *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *see Li-Wei Kao v. Erie Comm. Coll.*, No. 11-CV-415, 2015 WL 3823719, at *19 (W.D.N.Y. June 18, 2015) (intervening event between protected activity and plaintiff's termination broke causal connection based on temporal proximity). On the undisputed facts, any reasonable fact-finder would conclude that there were substantial intervening events between Plaintiff's September 2015 discrimination complaint and the elimination of the LPN position in December 2015. In that time, OMH had refused to reissue an operating certificate to Astor, in part due to concerns over inadequate coverage in the nursing department. (56.1 Stmt. ¶¶ 24, 25, 27.) Defendants then determined that eliminating the LPN position, a step recommended by OMH, (*id.* ¶ 33), and substituting RNs, would help resolve the staffing issues, (*id.* ¶ 38). OMH's refusal to reissue an operating certificate and the consequences that followed from it serve to break any inference of a causal connection between Plaintiff's complaint and the elimination of the LPN position.

Finally, even if Plaintiff did establish a *prima face* case of retaliation, Defendants have provided a legitimate, non-discriminatory reason for the elimination of the LPN position, as discussed *supra* Section III.A.2, and Plaintiff has not shown that reason to be pretextual. Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1981 retaliation claim.

D.  **Plaintiff's State Law Claim**

In addition to her claims under federal law, Plaintiff brought a claim under the New York State whistleblower statute, NYLL §§ 740 & 741. The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Having determined that all of the claims over which this Court has original jurisdiction should be dismissed on summary judgment, I decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law cause of action. *See id.* (citing 28 U.S.C. § 1367(c)(3)). Accordingly, Plaintiff's state law claim is dismissed without prejudice.

IV.  **CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED. The federal claims are dismissed with prejudice and the state claim is dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 68), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: August 16, 2017
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.